Filed 11/3/20  P. v. Magana CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D075886 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD262083) |
| EDWIN EDMUNDO MAGANA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

After law enforcement recovered large amounts of liquid and solid methamphetamines and several firearms from Edwin Edmundo Magana's property in Los Angeles County, they arrested and charged him in San Diego County. When Magana challenged venue, the People argued the drugs recovered at Magana's home had entered the United States through a port in San Diego and traveled the length of San Diego County before arriving in Los Angeles, creating a nexus with San Diego County. The superior court agreed. The case eventually went to trial in San Diego, and Magana was convicted.

Magana appeals his conviction, arguing that venue in San Diego County was improper. We conclude there was some evidence to support the superior court's determination, and we will affirm.

## BACKGROUND AND PROCEDURAL FACTS

In 2011 and 2012, the Drug Enforcement Administration (DEA) was targeting a "cell" of drug traffickers. Within this cell, the DEA had identified Armando Gomez as an individual who received drugs in Tijuana, packaged them, placed them in cars, and directed their transport across the United States border. The DEA had also identified Martin Bucio and Frederico Perez Ramirez as participants who received drug loads from Gomez in the United States.

To track these individuals, the DEA used wire taps. In one phone call on May 15, 2012, Gomez told Bucio where the drugs were in San Diego and when he could expect to receive the load. DEA Agent Holley testified: "Basically[, Gomez] was telling [Bucio], hey, this is where it's at, San Diego. It will be to you by whatever time." In other intercepted phone calls on May 18 and May 21, Gomez updated Ramirez about when to expect the drug loads heading to him. On May 22, the DEA intercepted calls involving Gomez that

2

identified an individual by name, a license plate, and provided a vehicle description.

On May 23, 2012, agents seized narcotics from the vehicle identified in the call at the San Ysidro port of entry in San Diego County. At that point in time, more than 99 percent of methamphetamines were manufactured in super labs in Mexico.

Gomez's cell transported anywhere from 25 to 50 pounds of drugs at a time from Tijuana through San Diego and into Los Angeles. The DEA never discovered any other mode of transportation; couriers moved drugs through the San Diego corridor to other parts of the country. The DEA confirmed drug loads crossed through San Diego's port of entry on May 15, May 18, and May 23, and Special Agent Holley testified that the DEA had multiple drug seizures in San Diego County, at the port of entry, from this drug organization.

The DEA intercepted additional calls in June. It tracked a call made June 18 to an address on Horace Avenue in Granada Hills, in Los Angeles County. Ramirez, who was inside the home, indicated he was counting a significant amount of drugs.

The following morning, law enforcement officers conducting surveillance of the home on Horace Avenue observed Bucio and Ramirez leave the property and followed them to another home in Los Angeles County, where 190.5 pounds of methamphetamine were later seized.

On June 19, 2012, Laverne Police Department Detective Devin Harden knocked on the door of the Horace Avenue home, and Magana answered. When Detective Harden asked Magana if there were drugs or guns in the home, Magana admitted there were both. He and his wife consented to a

search and provided law enforcement with access to a detached garage on the property.

Inside the garage, law enforcement recovered two AR-15 assault rifles, four semiautomatic handguns, and magazines and ammunition. Law enforcement found 26.6 kilograms, or 58.6 pounds, of solid methamphetamine and 59.6 liters, or 131.1 pounds, of liquid methamphetamine in the garage. Police also recovered $136,970 in U.S. currency from Magana's bedroom.

At trial, Magana testified he had met a woman at the park near his home who mentioned that she and her boyfriend, who had a restaurant together, were having financial problems and needed someplace to store their food for three to five weeks until they could get their own storage place. She asked Magana if they could store the food at his home, and he said they could. He said he did not know the stored items contained drugs.

Magana was charged with four felony counts: (1) possession for sale of powder Methamphetamine (Health & Saf. Code,[1] § 11378; count 1); (2) possession for sale of liquid methamphetamine (§ 11378; count 2); (3) possession of more than $100,000 dollars knowingly obtained from the unlawful sale, possession for sale, or transportation for sale, of a controlled substance (§ 11370.6, subd. (a); count 3); and (4) knowingly receiving or acquiring more than $25,000 dollars from a violation of the Uniform Controlled Substances Act (§ 11470.9, subd. (a); count 4). In connection with count 1, Magana was charged with four quantity allegations: one kilogram, four kilograms, 10 kilograms, and 20 kilograms. (§ 11370.4, subd. (b)(1)–(4)).) With respect to count 2, it was alleged that the liquid methamphetamine exceeded 30 liters. (§ 11370.4, subd. (b)(1).) The charging documents also

---

[1]    Further unspecified statutory references are to the Health & Safety Code.

4

alleged, in connection with counts 1 and 2, that Magana was personally armed with six firearms. (Pen. Code, § 12022, subd. (c).)

Before trial, defense counsel moved for a change of venue, arguing there were no criminal allegations with connections to San Diego County, and Los Angeles County offered a more appropriate venue because it was where the defendant resided, where witnesses and evidence were located, and where the crime occurred. At the hearing on the matter, Magana's attorney argued that Evidence Code section 781 did not provide a basis for venue because there were insufficient preparatory acts in San Diego County to justify venue.

The court concluded San Diego County was a proper venue because one of the preliminary acts was transporting the drugs from Tijuana to Los Angeles, necessitating travel through San Diego. The court noted that over 99 percent of the methamphetamines entering Los Angeles were produced in Mexico, no drugs were produced from any other location, including the United States, and the drugs managed by Gomez and Bucio specifically were entering through San Diego County; thus, there was a preponderance of evidence that there was a nexus with San Diego.

Following trial in San Diego, a jury found Magana guilty of all four counts and found true the weapons allegations attached to counts 1 and 2. The court sentenced Magana to 14 years four months in prison. Defendant timely appealed.

## DISCUSSION

The prosecution bears the burden at trial of proving by a preponderance of the evidence facts that establish venue in the county where the defendant is being prosecuted. (*People v. Thomas* (2012) 53 Cal.4th 1276, 1283 (*Thomas*).) We uphold the determination on appeal if there is some

evidence to support the finding.  (*Ibid.*; *People v. Chavarria* (2013) 213 Cal.App.4th 1364, 1369 (*Chavarria*).)

Generally, defendants are prosecuted in the venue in which the crime was committed.  (Pen. Code, § 777.)  However, Penal Code section 781 permits a defendant whose alleged crime has occurred in two jurisdictional territories to be prosecuted in "any competent court within either jurisdictional territory."  Penal Code section 781 is liberally construed (*People v. Posey* (2004) 32 Cal.4th 193, 202 (*Posey*)), and venue is proper in any county where " 'preparatory acts have occurred,' " even when those acts are not elements of the charged offense.  (*Thomas, supra,* 53 Cal.4th at p. 1284.)  Courts have determined preparatory acts include stealing firearms in one county before shooting a victim in a different county (*People v. Price* (1991) 1 Cal.4th 324, 385-386) and meeting victims in one county and making phone calls from there before killing the victims in another county (*People v. Douglas* (1990) 50 Cal.3d 468, 493-494).

Venue can also be based on " 'preparatory effects,' " or the effects of preparatory acts.  (*Thomas, supra,* 53 Cal.4th at pp. 1285, 1286; *Posey, supra,* 32 Cal.4th at p. 202.)  Thus, in a case like the one before us, venue is proper if " 'the acts or effects thereof constituting or requisite to the consummation of' defendant's unlawful possession occurred in [San Diego] County."  (*Thomas,* at p. 1284.)  In *Posey*, the Supreme Court concluded venue was proper in Marin County based on preparatory effects.  There, a police officer in Marin County paged the defendant in San Francisco, the defendant believed he was calling back the officer in Sonoma, and the defendant agreed to sell drugs in San Francisco, where the sale actually occurred.  (*Posey*, at p. 220.)  The court explained that even though the defendant may not have known he was placing a telephone call to Marin County, "venue turns on the presence or

6

absence, in a county, of acts or effects constituting the crime or requisite to the commission of the crime—not on the defendant's state of mind or on the soundness of any beliefs that he or she might hold as to the location of those acts or effects." (*Id.* at p. 221.)

The court in *Chavarria* likewise looked at the preparatory effects in determining venue. There, unlike in *Posey*, the defendant was not directly involved in the preparatory acts that formed the basis of venue. (*Chavarria, supra,* 213 Cal.App.4th at pp. 1370-1371.) Several phone calls were exchanged between an informant in Ventura County and a third person in Los Angeles County for the sale of drugs in Los Angeles. (*Id.* at p. 1367.) Although the defendant did not initiate or participate in the phone calls between the informant and the third party, the appellate court nonetheless concluded that the conversation in which the drug sale was negotiated was a preparatory act that occurred in two counties, Ventura and Los Angeles, making each appropriate for prosecution. (*Id.* at pp. 1370-1371.) Even though the defendant was not directly involved in those preparatory acts, "[t]he drug sale of which appellant was convicted was negotiated by his accomplice over the phone with an individual who was physically present in Ventura County. But for that call, there could have been no sale. Because this constitutes some evidence sufficient to support the finding that preparatory acts or effects requisite to commission of appellant's crimes took place in Ventura County, his motion to dismiss for lack of proper venue in that county was properly denied." (*Id.* at p. 1371.) Penal Code section 781 does not require the acts or effects " 'requisite to the consummation of the offense' " to directly involve the charged defendant. (*Chavarria*, at p. 1371.)

The question before us is whether there was "some evidence" of preparatory acts or effects in San Diego to justify venue in San Diego.

7

(*Thomas*, *supra*, 53 Cal.4th at p. 1283.) Magana argues there were not, primarily because there was no evidence of preparatory acts in San Diego, like drugs changing hands, stash houses, or phone calls. And he argues there were no effects from the drugs traveling through San Diego that would justify its imposition of venue.

We disagree with Magana's assessment of the evidence. While it is accurate that the People did not present evidence of stash houses in San Diego, there was some evidence of communication between members of the drug cell and couriers in San Diego. In particular, during the May 15 phone call intercepted by the DEA, Gomez conveyed to Bucio where, specifically, the courier transporting drugs was located in San Diego. In order to do that, the drug courier had to have communicated in some manner the load's location to Gomez. Although Magana, like the defendant in *Chavarria*, was not directly involved in those conversations, as long as preparatory acts or their effects occurred in San Diego County, even without a defendant's involvement, venue is proper. (*Chavarria,* 213 Cal.App.4th at pp. 1370-1371.)

Magana also argues that no preparatory acts or effects occurred in San Diego because the drugs traveled directly from the border to Los Angeles and there is no evidence the specific drugs recovered from Magana's home were those sent through San Diego. But because over 99 percent of all methamphetamines were created in Mexico super labs and the drugs had to move through San Diego County to get to Los Angeles, the act of transporting the drugs necessarily occurred in San Diego. Additionally, even if the courier

made no stops in San Diego County after passing through the port of entry,[2] he certainly accessed San Diego resources by traveling either along the Interstate 5 or Interstate 15 corridors.  Absent the drugs traveling through San Diego, Magana would not have had them in his possession; thus, there was some evidence of the preparatory acts or effects " 'requisite to the consummation of' defendant's unlawful possession." (*Thomas, supra,* 53 Cal.4th at p. 1284.)

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.



IRION, J.

---

[2]     Magana argues in both his opening brief and his reply that there was no evidence couriers stopped in San Diego because Agent Holley testified the drugs "came from the source, which is Tijuana, and [were] trafficked directly to [the house on] Horace [Avenue]."  However, this exchange addressed whether the drugs were sourced to any other distributors outside the chain. Agent Holley did not specify whether drugs were transferred to new couriers in San Diego after passing through the San Ysidro port of entry or whether the drugs were carried all the way to Los Angeles by the same individuals who transported them across the border, only that the drugs went directly to Magana's house.  There is no question that drugs were seized in San Diego County at the port of entry, or that they traveled through San Diego before arriving at Magana's property.

9